UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

FARAH DENNIS,

        Plaintiff,

v.                                     Case No.  5:08-cv-44-Oc-GRJ

MICHAEL J. ASTRUE, Commissioner of Social
Security,

        Defendant.

_____

## ORDER

Plaintiff appeals from a final decision of the Commissioner of Social Security ("the Commissioner") denying her applications for a period of disability, disability insurance benefits, and supplemental security income. (Doc. 1.) The Commissioner has answered (Doc. 17), and both parties have filed briefs outlining their respective positions. (Docs. 22 & 23.) For the reasons discussed below, the Commissioner's decision is due to be **AFFIRMED**.

## I. PROCEDURAL HISTORY

On August 22, 2003, Plaintiff filed applications for a period of disability, disability insurance benefits, and supplemental security income, alleging a disability onset date of May 9, 2003. (R. 42-45.) Plaintiff's application was denied initially and upon reconsideration. (R. 23-26; 28-29; 33–34 .) Thereafter, Plaintiff timely pursued her administrative remedies available before the Commissioner and requested a hearing before an Administrative Law Judge ("ALJ"). (R. 30-31.) The ALJ conducted Plaintiff's administrative hearing on February 15, 2006. (R. 208-24.) The ALJ issued a decision

unfavorable to Plaintiff on December 13, 2006. (R. 9-20.) Plaintiff's request for review of

the hearing decision by the Social Security Administration's Office of Hearings and

Appeals was denied.  (R. 5-7.) Plaintiff then appealed to this Court. (Doc. 1.)

## II. <u>STANDARD OF REVIEW</u>

The Commissioner's findings of fact are conclusive if supported by substantial

evidence.[1] Substantial evidence is more than a scintilla in that the evidence must do

more than merely "create a suspicion of the existence of [a] fact," and must include

"such relevant evidence as a reasonable person would accept as adequate to support

the conclusion."[2]

Where the Commissioner's decision is supported by substantial evidence, the

district court will affirm, even if the reviewer would have reached a contrary result as

finder of fact, and even if the reviewer finds that the evidence preponderates against the

Commissioner's decision.[3] The district court must view the evidence as a whole, taking

into account evidence favorable as well as unfavorable to the decision.[4] However, the

district court will reverse the Commissioner's decision on plenary review if the decision

applies incorrect law, or if the decision fails to provide the district court with sufficient

---

[1] *See* 42 U.S.C. § 405(g).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Richardson v. Perales, 402 U.S. 389, 401(1971); Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982)); *accord* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; *accord* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding court must scrutinize entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding court must also consider evidence detracting from evidence on which Commissioner relied).

reasoning to determine that the Commissioner properly applied the law.[5]  The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6] The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8] First, if a claimant is working at a substantial gainful activity, she is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in Title 20, Part 404, Subpart P, Appendix 1 of the Code of Federal Regulations, she is disabled.[11] Fourth, if a claimant's impairments do

---

[5] Keeton v. Dep't Health & Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *See* Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] Id. § 404.1520(c).

[11] Id. § 404.1520(d).

not prevent her from doing past relevant work, she is not disabled.[12] Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC"), age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[17] In a situation where both exertional and non-exertional impairments are

---

[12] 20 C.F.R. § 404.1520(e).

[13] Id. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); *see also* Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[15] Doughty, 245 F.3d at 1278 n.2.
In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.
Id. (internal citations omitted).

[16] Walker, 826 F.2d at 1002. Once the burden shifts to the Commissioner to show that the claimant can perform other work, the grids may come into play. Id.

[17] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Walker v. Bowen, 826 F.2d 996,
(continued...)

found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the grids as a framework to evaluate vocational factors so long as the ALJ introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[20] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[21]

## III. <u>SUMMARY OF THE RECORD EVIDENCE</u>

Plaintiff was thirty two (32) years old at the time of the ALJ's decision on December 13, 2006. (R. 9-20; 42; 211.) She has a highschool education and attended cosmetology school. (R. 64; 212.) Plaintiff has previous work experience as a housekeeper, cashier, and nurse's aide. (R. 59; 212-14.) Plaintiff contends that she has been unable to work since May 9, 2003 due to scoliosis, anemia, and depression. (R. 42; 58; 214; 223.) Plaintiff is insured for benefits through December 31, 2008. (R. 52.)

---

[17](...continued)
1003 (11th Cir. 1987) ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[18] <u>Walker</u>, 826 F.2d at 1003.

[19] <u>Wolfe</u>, 86 F.3d at 1077-78.

[20] *See* <u>id</u>.

[21] *See* <u>Doughty v. Apfel</u>, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001).

**A.      Evidence of Plaintiff's Pain**

In addition to the records from her primary care physician at the Florida Health Department,[22] the record contains medical evidence from Plaintiff's treating pain management specialist,[23] a consulting examining physician,[24] and two state agency non-examining physicians,[25] which document a long history of chronic neck and back pain with corresponding objective medical findings.

An x-ray performed on July 9, 2003 reveals scoliosis of the thoracic spine with angulation of 11 degrees convexed to the right. The x-ray also shows mild sclerotic change of the right sacro-iliac joint. (R. 101.)

Between March 2003 and January 2006, Plaintiff was seen over fourteen times by Dr. John Castiello, her primary care physician, at the Florida Department of Health for treatment of various medical issues. Nearly every visit, Plaintiff mentioned having problems with back pain. (R. 119-20, 177, 179, 181-82, 186-87, 190-92.) After Dr. Castiello's attempts to treat Plaintiff's pain with medication and physical therapy failed, he eventually referred Plaintiff to a pain specialist in December 2003. (R. 120.)

Dr. Edward L. Demmi saw Plaintiff for a consultative examination in November 2003 at the request of the Commissioner. Plaintiff reported with complaints of shortness of breath and pain as a result of the curvature in her spine. According to Plaintiff, she is

---

[22] (R. 115-31, 175-94.)

[23] (R. 132-47, 162-74.)

[24] (R. 148-51.)

[25] (R. 106-13, 152-58.)

in pain every day and the pain causes her to have problems when sitting or walking for long periods of time. Dr. Demmi noted that, although her gait was mildly antalgic due to an observed discrepancy in the length of her legs, Plaintiff was capable of ambulating without any assistance. Examination revealed full range of motion in the cervical spine and decreased range of motion in her lumbar spine. Dr. Demmi noted tenderness in her mid back up to the right shoulder and tenderness on the left in her lower back at the L4-L5 and L5-S1 levels. Dr. Demmi did not detect any muscle spasms in Plaintiff's back. Examination of Plaintiff's hands and wrists revealed no swelling, deformity or tenderness. Plaintiff's grip strength was intact and her fine manipulation was normal. Power and strength in both her upper and lower extremities was intact. Straight leg raise testing was normal. Dr, Demmi diagnosed Plaintiff with anemia and scoliosis. (R. 148-51.)

In December 2003, Dr. Donald Morford opined that Plaintiff was capable of frequently lifting up to ten pounds; occasionally lifting up to 20 pounds; sitting, standing and/or walking for about six hours of an eight hour work day; occasional bilateral reaching overhead; and occasional balancing, stooping, kneeling, crouching, and crawling. He placed no limitations on her ability to push or pull and opined that Plaintiff's reported symptoms were consistent with Dr. Demmi's medical examination report. (R. 106-13.)

Plaintiff began treatment with Dr. Murali Angirekula, her treating pain management specialist at the Citrus Pain Center, in December 2003. Plaintiff presented with complaints of severe low back pain, neck pain and pain in her lower extremities.

Plaintiff advised that she had tried Vioxx and Percocet but they were not effective. She rated her pain level as a "10" on a scale of 10. During his examination of Plaintiff, Dr. Angirekula noted that Plaintiff appeared to have discomfort with movement. Specifically, he observed that sitting up from a chair and getting on to the examination couch was "quite painful" for Plaintiff. Examination revealed Plaintiff had a normal gait, severely restricted range of motion in her lumbar spine, and mild scoliosis of the thoracic spine to the right side with no obvious deformities in her lower back. Dr. Angirekula noted severe tenderness to palpation in Plaintiff's lumbar spine musculature bilaterally; mild tenderness of her gluteal region; and "fairly prominent" tenderness in her neck musculature. Plaintiff demonstrated "considerably restricted" range of motion in her cervical spine. Straight leg raise testing was positive. Accordingly, Dr. Angirekula recommended Plaintiff commence a series of caudal epidural steroid injections during the same office visit in an effort to "provide good relief of [Plaintiff's] pain so that she can function better." (R. 145-47.)

One week later, Plaintiff returned for the second injection reporting that the previous injection had offered some relief. She estimated that she was feeling 30 to 40% better. Examination revealed that Plaintiff was comfortable at rest but still had restrictions with mobility secondary to her pain. Dr. Angirekula observed intense tenderness on palpation of Plaintiff's lumbar muscles. After administration of the second injection, Plaintiff was advised to return in a week for the third injection of the series. (R. 143-44.)

When Plaintiff returned for the third and final injection, she reported that she continued to feel improvement of her symptoms and estimated that she was about 50 to 60% improved since her first office visit. Plaintiff advised that she was "able to get around better." Examination revealed slight improvement in the tenderness in Plaintiff's lumbar muscles as well as improved mobility in her lumbar spine. (R. 141-42.)

Thereafter, Plaintiff saw Dr. Angirekula approximately once a month until November 2004 when she started seeing him only once every other month. Between January and November 2004, during his examinations of Plaintiff, Dr. Angirekula frequently observed that Plaintiff was comfortable at rest. (R. 132-34, 136, 139, 168-69, 172-74.) Although Plaintiff did experience occasional exacerbations of her pain,[26] examinations revealed gradually improving tenderness to palpation in Plaintiff's cervical and lumbar muscles. (R. 132-38, 168, 171, 174.)

For example, in February 2004, Plaintiff deferred examination of her lower back because "she is feeling better" and according to Plaintiff, Dr. Angirekula's treatment was "helping considerably." (R. 136-38.) In March 2004, Plaintiff reported that her lumbar pain was "considerably improved." (R. 134-35.) In April and November 2004, Dr. Angirekula's examination of Plaintiff revealed that Plaintiff was more comfortable both at rest *and with movement.* (R. 132-33, 168.) According to Dr. Angirekula, Plaintiff was "able to tolerate her activities a little better." (R. 132-33.) In June and September 2004,

---

[26] In January 2004, Plaintiff reported an exacerbation of her pain level due to an attempt at physical therapy. (R. 139-40.) In March 2004, Plaintiff advised that the steroid injection Dr. Angirekula administered to her cervical spine at the previous office visit caused a temporary flare up in her cervical pain. (R. 134-35.) In September 2004, Plaintiff complained of a slight increase in her pain level due to stormy weather. (R. 171.)

Dr. Angirekula observed that Plaintiff's mobility was only "slightly restricted" by her pain. (R. 171, 174.)

Dr. Angirekula prescribed morphine for treatment of Plaintiff's cervical spine pain in March 2004 but subsequently changed Plaintiff's prescription to methadone in April pursuant to Plaintiff's complaints that, although it helped, morphine made her too drowsy. (R. 133-35.) During an office visit in late April 2004, Plaintiff rated her pain as "6" out of ten and advised that her pain level was "considerably improved" and that methadone was "working far better than the morphine." (R. 132.) Thereafter, Plaintiff consistently reported that her pain "reasonably well controlled" and/or managed by methadone. (R. 168, 171-74.) Further, Dr. Angirekula noted that Plaintiff was tolerating the medication "quite well" without any side effects such as drowsiness or nausea. (R. 171.)

Despite this pattern of improvement, during Plaintiff's office visit with Dr. Angirekula in October 2004, Plaintiff advised that, "while methadone helps her far better than most [medications she has tried], she is not able to work because of the severe pain." She complained that she was unable to sit or stand for any significant amount of time and that, after standing for 10 to 15 minutes, her pain was intense. (R. 169.) During the same office visit, Dr. Angirekula prepared a Medical Verification Form on behalf of Plaintiff in which he noted that Plaintiff's medical condition permitted her to work with restrictions. Specifically, Plaintiff was directed to avoid strenuous activity, and lifting more than 20 pounds. However, in the very next sentence on the form, Dr. Angirekula opined that Plaintiff was unable to work "due to severe pain." (R. 170.)

Dr. Reuben Brigety, a non-examining state agency physician, prepared a second functional assessment in July 2004. Based upon his review of the July 2003 x-ray results, Dr. Demmi's November 2003 consultative examination report, and Dr. Angirekula's April 2004 progress note, Dr. Brigety updated Plaintiff's functional assessment and opined that Plaintiff was capable of frequently lifting up to ten pounds; occasionally lifting up to 20 pounds; and occasional balancing, stooping, kneeling, crouching, and crawling. Although he placed no limitations on Plaintiff's ability to reach overhead, he limited Plaintiff to occasional pushing and/or pulling with her lower extremities due to the discrepancy in the length of her legs. Dr. Brigety did not offer an opinion concerning Plaintiff's ability to sit, stand and walk over the course of an eight hour work day. (R. 367-74.)

Beginning in January 2005, Dr. Angirekula's examinations of Plaintiff revealed significantly improved levels of tenderness in her cervical and lumbar muscles. In addition, during examinations, Dr. Angirekula consistently observed Plaintiff to be comfortable at rest and with movement. (R. 162-67.)

By March 2005, Dr. Angirekula opined that Plaintiff's pain level had stabilized and that Plaintiff was "able to function fairly well with the pain medication." (R. 166.) In September 2005, Dr. Angirekula noted that Plaintiff was taking methadone every twelve hours and "that seems to help her to a certain degree. While it does not take care of her pain completely, it does make it more tolerable to where she can cope and function well." Finally, during his examination of Plaintiff in November 2005, Dr. Angirekula observed that Plaintiff "appeared comfortable both at rest and with movement as she

walked in and out of the examination room." According to Dr. Angirekula, "[Plaintiff] is able to stay functional because of her pain medication." (R. 162.)

Dr. Castiello, Plaintiff's primary care provider from the Florida Department of Health, prepared a medical source statement in May 2005 in which he opined that Plaintiff was capable of working between 11 and 20 hours per week and that she was limited to lifting ten pounds. (R. 192.)

## B.    Evidence Concerning Plaintiff's Mental Health

In November 2003, Plaintiff presented to Dr. Demmi for a consultative examination with no complaints of mental health problems. Dr. Demmi's report made no mention of Plaintiff having a history of mental health problems. Upon examination, Plaintiff's neurological system was unremarkable and a mental status examination revealed Plaintiff's mood, affect, and intellectual functioning were normal. (R. 148-51.)

In fact, Plaintiff's initial applications for disability, disability insurance benefits and social security income made no mention of Plaintiff's depression and/or anxiety. (R. 42.) It was not until her appeal of the Social Security Administration's decision that Plaintiff first mentioned any mental health complaints. (R. 94.) In a form entitled, "Disability Report - Appeal," dated September 2, 2004, Plaintiff complained for the first time of having problems with being impatient, depressed, tired, having mood swings, and getting "upset because [she] can't do the things I used to do." (R. 94.) In the first two disability reports Plaintiff submitted to the Social Security Administration—including one dated just thirty-six days prior—she did not mention any mental health problems. (R. 57-66, 87-93.)

Non-examining state agency physicians reviewed Plaintiff's medical records in December 2003 and again in July 2004 and completed a corresponding Physical Residual Functional Technique form. (R. 106-13, 152-58.) Neither state agency physician mentioned any functional limitations resulting from any mental health impairments.

Although Plaintiff reported to Dr. Castiello, her primary care physician at the Florida Department of Health for medical treatment on eight different occasions between March 2003 and December 2004, Plaintiff reported no mental health complaints until February 2005. (R. 117, 121, 125-26, 175, 181, 186.) Pursuant to her complaints of having feelings of depression and sleep problems due to her pain, Dr. Castiello prescribed Wellbutrin®, an anti-depressant. (R. 175, 181, 186.) Plaintiff returned in May and June 2005 with continued complaints of sleep disturbances due to pain. (R. 181-82.) After noting that Plaintiff "didn't try" Wellbutrin®, Plaintiff's primary care physician prescribed Effexor® to help with her sleeping problems. (R. 182.)

Dr. Castiello's medical source statement dated May 2005 listed Plaintiff's medical problems as: scoliosis, elevated globulin level, sleep problem, anemia, high cholesterol, and acid reflux. There was no mention of depression. (R. 192.)

C.    **Plaintiff's Testimony**

During her hearing before the ALJ in February 2006, while most of Plaintiff's complaints centered around pain in her neck and back, she also complained of depression. (R. 208-24.) According to Plaintiff, she experiences pain in her upper and lower back due to scoliosis "every day, all day." (R. 215.)

13

She testified that she takes methadone to treat the pain. Her doctor has counseled her to try to cut back on how much she takes on a regular basis to prevent future health problems due to extended use of the drug. (R. 215-16.) Plaintiff testified that her pain management doctor also treated her with morphine and injections. She discontinued taking morphine because they caused bad side effects such as vomiting and drowsiness. Accordingly to Plaintiff, the injections were not helpful. (R. 216.)

Plaintiff testified that she feels depressed, impatient, upset and has mood swings "all the time." Plaintiff directly attributed her mental health complaints to her inability to get complete relief from her pain. (R. 220-24.) Plaintiff does not take any medications for depression. (R. 219.)

At the conclusion of the hearing, the ALJ granted counsel's request for Plaintiff to be sent for an additional consultative examination to assess the degree of Plaintiff's depression. (R. 223-24.) Accordingly, in April 2006, Plaintiff was sent for a psychological consultative examination with Gary Honickman, Ph.D., a clinical psychologist. (R. 195-200.)

Dr. Honickman noted Plaintiff's subjective complaints of feeling worried and depressed and opined that Plaintiff appeared to be mildly depressed. According to Plaintiff, her feelings of depression fluctuate depending on the level of pain she is experiencing. Plaintiff advised that she was not currently taking any anti-depressants and she denied ever seeking treatment from a mental health professional. Examination of Plaintiff revealed that she demonstrated good fund of general information, her thought processes were organized, and her insight and judgment were fair. Minnesota

Multiphasic Personality Inventory (MMPI)-2 testing revealed significant elevations with respect to hysteria, hypochondriasis, and depression. According to Dr. Honickman, "[p]atients with profiles like hers are typically non-psychotic and are free of confusion. . . They are usually passive dependent individuals and hypochondriacal tendencies are usually present." Accordingly, Dr. Honickman diagnosed Plaintiff with Pain Disorder associated with a medical condition. (R. 195-97.)

In June 2006, Dr. Honickman completed a medical source statement in which he opined that: Plaintiff's abilities to understand, remember, and carry out short, simple instructions, and to interact appropriately with the general public were intact; Plaintiff was slightly impaired[27] in her abilities to understand, remember, and carry out detailed instructions, make judgments on simple work-related decisions, to interact with supervisors and coworkers, and to respond appropriately to changes in work setting; and Plaintiff was moderately impaired[28] in her ability to respond appropriately to work pressures in usual work setting. (R. 198-200.)

D.     **The ALJ's Findings**

In the ALJ's review of the record, including Plaintiff's testimony, and medical records from several health care providers, the ALJ determined that Plaintiff suffers from scoliosis of the thoracic spine and S1 joint sclerosis. (R. 14.) While these impairments are severe, the ALJ determined that Plaintiff did not have an impairment or

---

[27] Slight impairment was defined as "[t]here is some mild limitation in this area, but the individual can generally function well." (R. 198.)

[28] Moderate impairment was defined as "[t]here is moderate limitation in this area but the individual is still able to function satisfactorily." (R. 198.)

combination of impairments which met or medically equaled one of the impairments listed in Title 20, Part 404, Subpart P, Appendix 1 of the Code of Federal Regulations. (R. 16.) Specifically, the ALJ found that the objective medical evidence fails to establish that Plaintiff met the criteria of Section 1.04 of the Listings of Impairments because "there is no evidence of nerve root compression or an inability to ambulate effectively." (R. 16.)

The ALJ then found that Plaintiff retained the RFC to perform the exertional demands of sedentary work. (R. 16-17.) The ALJ limited Plaintiff to lifting up to ten pounds; standing and/or walking for two hours in an eight hour workday; and sitting for six hours in an eight hour workday. He further found that Plaintiff is able to occasionally climb, balance, stoop, kneel, crouch, and crawl.

As for mental impairments, the ALJ found that Plaintiff did not suffer from a severe mental impairment and that she has no restriction of activities of daily living; and mild difficulties in maintaining concentration, persistence, and pace; with no episodes of decompensation. (R. 16.)

After finding that Plaintiff could not perform her past relevant work as a housekeeper, cashier, or nurse's aide, the ALJ applied Rule 201.27 of the Medical-Vocational Guidelines (the "grids")[29] as a "framework" and found that Plaintiff was not disabled. (R. 19.)

---

[29] 20 C.F.R. § 404, subpt. P, app. 2.

## IV. <u>DISCUSSION</u>

Plaintiff raises three issues in her appeal. First, Plaintiff argues that the ALJ improperly disregarded Plaintiff's pain testimony in violation of the Eleventh Circuit pain standard. Next, Plaintiff argues that the ALJ committed legal error by failing to find Plaintiff's depression to be a severe impairment at step two of the sequential analysis. Finally, Plaintiff contends that the ALJ erred by failing to obtain vocational expert testimony at step five of the sequential analysis to address Plaintiff's depression as a severe nonexertional impairment.

## A.     The ALJ Did Not Err in Partially Discrediting Plaintiff's Pain Testimony.

Plaintiff's first argument challenges the ALJ's assessment of the credibility of her subjective complaints and testimony. "[C]redibility determinations are the province of the ALJ."[30] In evaluating a disability, the ALJ must consider all of a claimant's impairments, including his subjective symptoms such as pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.[31]  Where, as here, an ALJ decides not to fully credit a claimant's testimony about subjective complaints concerning the intensity, persistence and limiting effects of symptoms, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.[32]  A reviewing court will

---

[30] <u>Moore v. Barnhart</u>, 405 F.3d 1208, 1212 (11th Cir. 2005) (per curiam).

[31] 20 C.F.R. § 404.1528.

[32] <u>Foote v. Chater</u>, 67 F.3d 1553, 1561-62 (11th Cir. 1995); <u>Jones v. Dep't of Health & Hum. Servs.</u>, 941 F.2d 1529, 1532 (11th Cir. 1991) (finding that articulated reasons must be based on substantial evidence); <u>Cannon v. Bowen</u>, 858 F.2d 1541, 1545 (11th Cir. 1988).

not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.[33]

In the instant case, it appears as though the ALJ applied the Eleventh Circuit's pain standard "threshold"[34] assessment to Plaintiff's subjective complaints by noting the Plaintiff's scoliosis and chronic back pain. While the ALJ did not cite the exact language of the standard, he did state that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. §§ 404.1529 and 416.929 and SSRs 96-4p and 96-7p." (R. 17.) This language, a paraphrase of the pain standard, along with the supporting findings, shows that the ALJ applied the pain standard. Moreover, the ALJ cited 20 C.F.R. § 404.1529, which contains the same language regarding subjective testimony that the Eleventh Circuit interpreted when initially establishing the pain standard.[35]

In applying the pain standard, the ALJ found that Plaintiff met the initial burden of showing an underlying medical condition that could be expected to give rise to pain. Once Plaintiff met this initial burden, however, the ALJ found Plaintiff's statements concerning the "intensity, persistence, and limiting effects of these symptoms are not entirely credible." (R. 17.)

---

[33] Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986).

[34] Marbury v. Sullivan, 957 F.2d 837,  839 (11th Cir. 1992).

[35] See Wilson v. Barnhart, 284 F.3d 1219, 1226 (11th Cir. 2002).

According to Plaintiff, the ALJ improperly discredited her complaints of pain. In opposition, the Commissioner argues that the ALJ properly discredited Plaintiff's testimony to the extent that she testified that her pain precluded her from performing the exertional demands of sedentary work.

The ALJ did not reject Plaintiff's complaints of severe back pain, as suggested by Plaintiff, but rather explicitly recognized that "[m]edical evidence reveals that the claimant experiences pain in her neck and lower back." (R. 17.) Thus, while the ALJ did not fully credit Plaintiff's subjective complaints of pain, the ALJ still gave Plaintiff's testimony significant weight. Indeed, in assessing Plaintiff's residual functional capacity, the ALJ chose to give greater weight to Plaintiff's complaints than to the opinions of the state agency physicians because he found Plaintiff's functional capacity to be more limited than that described by the state agency physicians.

An individual's residual functional capacity ("RFC") is "the most [he / she] can still do despite [his / her] limitations."[36] "'[S]edentary work' represents a significantly restricted range of work. Individuals who are limited to no more than sedentary work by their medical impairments have very serious functional limitations."[37] Thus, by finding that Plaintiff retained the residual functional capacity to perform sedentary work, the ALJ discredited Plaintiff's testimony only to the extent that Plaintiff alleged her pain was totally incapacitating.

---

[36] 20 C.F.R. § 404.1545(a)(1).

[37] SSR 96-9p.

In support of his decision not to fully credit Plaintiff's testimony that her pain was totally incapacitating, the ALJ favorably relied upon the fact that Plaintiff's treating pain management specialist, Dr. Angirekula, repeatedly noted that methadone improved Plaintiff's pain levels and that the medication enabled Plaintiff to cope and function "fairly well." (R. 132, 162-63, 166, 168, 171-74, 174.) The ALJ thoroughly discussed all of Dr. Angirekula's progress notes—including the medical source statement he prepared in October 2004—spanning the period between December 2003 and November 2005. In doing so, the ALJ concluded that, while Dr. Angirekula's notes contain some mention of the occasional exacerbations of her pain, overall Dr. Angirekula's records demonstrate a pattern of significant improvement over time. For example, Dr. Angirekula's progress note dated March 2005, documents that Plaintiff's pain level eventually "stabilized" and was "reasonably well controlled" by methadone. (R-166.) Further, during an examination in November 2005, Dr. Angirekula observed that Plaintiff "appeared comfortable both at rest and with movement as she walked in an out of the examination room." (R. 162.)

The ALJ further found that Dr. Angirekula's observations were consistent with the findings of consultative examining physician, Dr. Demmi. Dr. Demmi observed that Plaintiff was able to walk without assistance, had normal range of motion in her cervical spine, decreased range of motion in her lumbar spine, normal grip strength and her fine manipulation and motor strength in her upper and lower extremities were intact.

The ALJ provided specific reasons, supported by the evidence in the record, to explain why he gave limited weight to Dr. Angirekula's medical source statement.

Among other reasons, the ALJ noted that Dr. Angirekula's opinion on the form: (1) provided conflicting information about Plaintiff's ability to work; (2) was inconsistent with Dr. Angirekula's own treatment notes which evidenced that the pain medications taken by Plaintiff worked sufficiently well enough to make her functional; and (3) was inconsistent with Dr. Demmi's findings. (R. 18.)

A treating physician's opinion on the nature and severity of a claimant's impairments is to be given controlling weight where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record.[38] However, the ALJ has the discretion to give less weight to a treating physician's opinion or report regarding the claimant's capacity to work if the opinion is wholly conclusory or unsupported by objective medical evidence.[39] A treating physician's conclusory statements are entitled to only such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.[40]

In his medical source statement, Dr. Angirekula stated inconsistently that Plaintiff was incapable of work "due to severe pain" and at the same time that Plaintiff could work subject to the limitation that she avoid strenuous activity and lifting more than twenty pounds. (R. 170.) Indeed, the exertional limitations on lifting provided by Dr.

---

[38] 20 C.F.R. § 404.1527(d)(2).

[39] Edwards v. Sullivan, 937 F.2d 580, 584 (11th Cir. 1991) (ALJ had no obligation to defer to treating physician's report where physician conceded he was unsure of the accuracy of his findings).

[40] Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir.1986); *see also* Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987).

Angirekula is consistent with the ALJ's RFC assessment that Plaintiff is limited to sedentary work.

Moreover, Dr. Angirekula's medical source statement is at odds with his own progress notes which document a pattern of improvement in Plaintiff's pain level as a result of taking pain medication. According to Dr. Angrikula's notes, the Plaintiff's pain was stabilized and well controlled by the pain medications.

Lastly, as discussed above, Dr. Angrkula's conflicting statement that Plaintiff was incapable of work is completely at odds with the clinical findings in Dr. Demmi's consultative examination.

Accordingly, the Court concludes that the ALJ did not err in his analysis and evaluation of the functional limitations caused by Plaintiff's pain. The ALJ articulated specific reasons for not accepting Plaintiff's complaints that her pain rendered her incapable of performing any work activity, even at the limiting sedentary level.

**B.    The ALJ Properly Concluded that Plaintiff's Depression Is a Non-Severe Impairment.**

Plaintiff next argues that the ALJ failed to properly consider Plaintiff's depression at step two of the sequential analysis. Specifically, Plaintiff contends that the ALJ failed to assign any limitations to Plaintiff's depression.

At step two of the sequential analysis, the ALJ must "consider the medical severity of [the claimant's] impairments."[41]  In doing so, the ALJ must determine whether

---

[41] *See* Wind v. Barnhart, 133 Fed. Appx. 684, 690 (11th Cir. 2005) (quoting Phillips v. Barnhart, 357 F.3d. 1232, 1237 (11th Cir. 2004)).

the impairments, alone or in combination, "significantly limit" the claimant's "physical or mental ability to do basic work skills."[42] For a medical condition to be considered "severe," it must constitute more than a "deviation from purely medical standards of bodily perfection or normality."[43] Thus, a diagnosis of "depression" does not necessarily compel the conclusion that the condition is disabling.[44] Although the threshold for meeting the definition of a "severe impairment" at step two is low, the burden is on the Plaintiff to provide evidence demonstrating the disabling impact of her depression.[45]

The Commissioner argues that in determining the severity of a condition, it "must be measured in terms of its effect upon an individual's ability to work. . . . Thus, the important inquiry is not whether an individual has depression, or even moderate symptoms, but how those symptoms limit specific work-related activities."[46]

With respect to Plaintiff's depression, the ALJ found that Plaintiff's mental impairments produced "no restrictions of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence,

---

[42] Basic work activities include: "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling; seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment, responding appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting." SSR 85-28.

[43] McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986).

[44] 20 C.F.R. §§ 404.1520(c), 416.920(c); *see also* Wind, 133 Fed. Appx. at 690 (quoting McCruter, 791 F.2d at 1547); Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) ("[t]here must be a showing of related functional loss" for a psychological disorder to be considered disabling).

[45] Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[46] (Doc. 23 pp. 9-10.) (citing McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986)).

or pace, and no episodes of decompensation." (R. 16.) This conclusion was supported by substantial record evidence.

As a starting point, Plaintiff has no history of mental health treatment and she testified she is not currently taking anti-depressants. (R. 195-97, 219.) Moreover, based on his April 2006 psychological evaluation, Dr. Honickman diagnosed Plaintiff with a pain disorder associated with a medical condition. Consistent with Plaintiff's testimony that her depressed mood fluctuates with the intensity of her pain, Dr. Honickman noted that pain is Plaintiff's most significant physical symptom. (R. 196.) Based on his findings, Dr. Honickman subsequently prepared a mental residual functional capacity assessment of Plaintiff in June 2006 in which he opined that Plaintiff's depression resulted in minimal limitations. Specifically, Dr. Honickman found that Plaintiff's ability to perform most work related activities was either intact or only slightly limited. Further, the only impairment Dr. Honickman found to be anything more than "slight" was Plaintiff's ability to respond appropriately to work pressures in usual work settings which was assessed to be "moderately" impaired.

In finding Plaintiff's mental impairment to be non-severe, the ALJ explained that he gave significant weight to Dr. Honickman's opinion specifically noting that "[Plaintiff] would have zero to slight restrictions in the majority of tasks involving responding appropriately to supervision, co-workers, and work pressures in a work setting." (R. 16.) There is no evidence in the record that Plaintiff ever sought treatment from a mental

health care provider.[47] The only evidence that Plaintiff was prescribed medication that could have treated mental health complaints is limited. Specifically, she was prescribed—but did not take—Wellbutrin in February 2005. Thereafter, Plaintiff's primary care provider prescribed Effexor for treatment of her sleep disturbances. In assessing Plaintiff's condition, Dr. Castiello noted that Plaintiff's sleep problems were directly related to her pain complaints. Despite several subsequent visits to Dr. Castiello, Plaintiff was never diagnosed with depression nor referred to a mental health care specialist.

Further, even if Plaintiff's depression was sufficient to pass step two analysis the result would be no different because there was no evidence that Plaintiff's depression limited the mental activities generally required by skilled or unskilled sedentary work.[48] There is no evidence that Plaintiff has ever experienced any medically documented difficulties with her activities of daily living, social functioning, or concentration and task persistence as a result of depression.

In sum, the evidence of record does not establish a mental impairment that significantly limits Plaintiff's ability to do basic work skills. Accordingly, the ALJ's conclusion that Plaintiff's mental impairments produced  "no restrictions of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in

---

[47] *See* 20 C.F.R. § 404.1529(c)(3)(v); Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).

[48] *See, e.g.*, Miller v. Barnhart, 182 Fed. Appx. 959, 964 (11th Cir. 2006) (holding that even where ALJ improperly applied the regulations in reaching his decision, it did not constitute reversible error because the correct application would not contradict the ALJ's ultimate findings).

maintaining concentration, persistence, or pace, and no episodes of decompensation" is supported by substantial record evidence.

## C.     The ALJ Properly Relied on the Grids

Finally, Plaintiff contends the ALJ erred in relying on the grids and should have obtained vocational expert testimony. In opposition, the Commissioner argues that the Commissioner fulfilled his burden at step five of the sequential analysis by properly employing Rule 201.27 of the grids because Plaintiff did not show she was unable to perform a wide range of sedentary work.

In order to meet the qualifications for unskilled sedentary work—the RFC the ALJ concluded could be performed by Plaintiff—an individual must: have basic communication skills; be able to understand, remember and carry out simple instructions; be able to engage in simple decision-making, and respond appropriately in usual work situations and adapt to a routine work setting.[49]

At step five of the sequential analysis, the burden of proof shifted to the Commissioner to establish that the claimant could perform other work that exists in the national economy.[50] In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant.[51] This burden may sometimes be met through exclusive reliance on the grids when each variable on the appropriate grid accurately describes the claimant's

---

[49] SSR 96-9p.

[50] Foote v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995).

[51] See Allen v. Sullivan, 880 F.2d 1200, 1201 (11th Cir. 1989).

situation.[52] Exclusive reliance on the grids is appropriate when the claimant is able to perform a full range of work at a given functional level or when a claimant has non-exertional impairments that do not significantly limit basic work skills.[53]

Here, the ALJ relied exclusively on the grids because the ALJ concluded that Plaintiff had the exertional capacity to perform substantially all of the requirements of unskilled sedentary work. (R. 18-19.) Using Title 20, Part 404, Subpart P, Appendix 2, Rule 201.27 of the Code of Federal Regulations as a "framework", the ALJ found that Plaintiff's profile as a younger individual able to perform essentially a full range of unskilled sedentary work guided the ALJ to a finding of "not disabled."[54]

There is substantial evidence in the record to support the ALJ's conclusion that Plaintiff's mental impairments did not significantly limit Plaintiff's ability to handle the mental demands of unskilled sedentary work during the relevant time period. Notably, even though Plaintiff testified to having problems with depression, Plaintiff did not list any mental impairments as a basis for disability on her initial applications. In addition, she never sought treatment from a psychologist or psychiatrist. In fact, Plaintiff's medical records offer no objective medical evidence to support her subjective complaints of depression. More importantly, the only evidence concerning any functional limitations associated with Plaintiff's diagnosis of pain disorder comes from

---

[52] *See* Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987).

[53] Specifically, the Eleventh Circuit has held that "non-exertional limitations can cause the grid to be inapplicable only when the limitations are severe enough to prevent a wide range of gainful employment at a designated level." Murray v. Heckler, 737 F.2d 934, 935 (11th Cir. 1984).

[54] "Age: Younger individual age 18-44; Education: High school graduate or more; Previous Work Experience: Unskilled or none; Decision: Do." 20 C.F.R. § 404, subpt. P, app. 2, T.1.

Dr. Honickman who opined that Plaintiff had no more than a slight limitation in her ability to perform most of the basic work activities generally required by unskilled sedentary work.[55]

Therefore, the ALJ adequately addressed Plaintiff's mental limitations and the ALJ's conclusion that Plaintiff did not have a severe mental limitation is fully supported by the evidence of record. Accordingly, the Court concludes that the ALJ did not err in applying the grids, instead of using a VE, because Plaintiff's slight mental impairments did not erode the work base for unskilled sedentary work.

## V. CONCLUSION

In view of the foregoing, the decision of the Commissioner is due to be **AFFIRMED**. The Clerk is directed to enter final judgment in favor of the Commissioner consistent with this Order and close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on April 28, 2009.

GARY R. JONES
United States Magistrate Judge

Copies to:
    All Counsel

---

[55] The mental activities generally required by unskilled work include: understanding, remembering, and carrying out simple instructions; making simple work-related decisions; responding appropriately to supervision and usual work situations; and dealing with changes in a routine work setting. SSR 96-9p.